## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| BENJAMIN D. MIKKALSON, | Civil No. 14-4208 (JRT/JSM) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| CITY OF SOUTH ST. PAUL, WILLIAM MESSERICH, *in his official and individual capacity*, MICHAEL RUNNING, *in his individual capacity*, DAVID GREENGO, *in his individual capacity*, and JOHN DOE 1, *in his individual capacity*. | |
| Defendants. | |

Peter D. Mikkalson, **PETER D. MIKKALSON LAW OFFICES**, 2304 San Marcos Street, Blacksburg, VA 24060, for plaintiff.

Daniel P. Kurtz, **LEAGUE OF MINNESOTA CITIES**, 145 University Avenue West, St. Paul, MN 55103, for defendants.

Plaintiff Benjamin Mikkalson brings this action against Defendants Sergeant Michael Running, Sergeant David Greengo, Police Chief William Messerich, and the City of South St. Paul ("the City"), alleging claims under 42 U.S.C. § 1983 and Minnesota state law based on two separate police stops. During the first stop, Mikkalson alleges that Running violated his Fourth Amendment rights by detaining him near the scene of a recent burglary and taking his driver's license under a threat of arrest. During the second stop, Mikkalson alleges that Greengo violated his Fourth Amendment rights by detaining him during a purported traffic stop, taking his driver's license under a threat

of arrest, entering a garage that he was renting without a warrant or consent, and failing to promptly return his driver's license at the conclusion of the stop.  Mikkalson also brings a trespass claim against Greengo based on the garage entry, and a claim under Article I, § 10 of the Minnesota Constitution against Running, Greengo, Messerich, and the City.  All Defendants now move for summary judgment on all claims.

The Court will grant Running's motion for summary judgment on Mikkalson's § 1983 claim because Running is entitled to qualified immunity.  The Court will grant in part and deny in part Greengo's motion for summary judgment on Mikkalson's § 1983 claim – Greengo is entitled to qualified immunity for all aspects of the stop except for the garage entry.  The Court will also deny Greengo's motion for summary judgment on Mikkalson's trespass claim because Greengo is not entitled to official immunity.  Finally, the Court will grant summary judgment in favor of all Defendants on Mikkalson's state constitution claim because Mikkalson has failed to produce evidence showing that he is entitled to injunctive, declaratory, or other equitable relief.

## BACKGROUND

### I.    RUNNING INCIDENT: DECEMBER 8, 2011

Michael Running is a sergeant with the South St. Paul Police Department and has worked for the department for twelve years.  (Aff. of Michael Running ("Running Aff.") ¶¶ 1, 3, Nov. 2, 2015, Docket No. 24.)   On December 8, 2011, at approximately 1:37 a.m., Running and several other officers responded to a radio call that an audible burglary alarm had been triggered at the Thomas Jewelry store.  (*Id.* ¶ 5.)   Running

arrived on the scene at approximately 1:40 a.m. and observed that the front window of the store was broken.  (*Id.* ¶ 6.)  Because Running and the other officers did not know whether the burglar was still inside, they arranged for a police K9 to search the building. (*Id.* ¶ 8.)  They also broadcast a "10-33" radio code, which alerts "everyone on [the] dispatch channel to stay off of the radio because a serious or significant event is occurring." (*Id.* ¶ 7.)  The K9 search concluded at 1:55 a.m., and officers determined that the store was empty. (*Id.* ¶ 9.)  The "10-33" radio code was accordingly lifted.  (*Id.*)

At approximately 2:00 a.m., twenty-three minutes after Running and the other officers first responded to the burglary alarm, Running observed a man who he later identified as Mikkalson approaching the scene.  (*Id.* ¶ 10.)  Mikkalson was walking by a park bench and bus stop located directly in front of the parking lot for Thomas Jewelry. (Aff. of Daniel P. Kurtz ("Kurtz Aff."), Ex. 4 ("Mikkalson Dep.") at 25:6-26:11, 32:22-33:3, Nov. 2, 2015, Docket No. 26.)  Running stated that he decided to stop and speak with Mikkalson in order to determine whether he was involved in the burglary.  (Running Aff. ¶ 11.)  Running noted that he took this action because it was late, there were very few people in the area at the time,[1] Mikkalson was in the immediate vicinity of where the burglary had recently occurred, and Running knew from experience that it is "fairly common" for an individual who committed a burglary to return to the scene or remain at the scene in order to retrieve stolen items "stash[ed]" nearby.  (*Id.* ¶¶ 11-12.)  Running

---

[1] Mikkalson testified that he saw several people outside of an apartment building across the street from the jewelry store.  (Mikkalson Dep. at 24:4-18.)  Also, Running interviewed three other individuals near the crime scene.  (Running Aff., Ex. 1 at 3-4.)

also stated that he was interested in speaking with Mikkalson as a potential witness, because he may have seen something or may have information about the burglary. (*Id.* ¶ 11.)

According to Mikkalson, Running stopped him and asked what he was doing in the area. (Mikkalson Dep. at 26:16-18.) Mikkalson responded that he was walking to a nearby Redbox to return an item he had rented and was looking at the police activity outside of the jewelry store. (*Id.* at 26:18-21.) Mikkalson and Running briefly argued about whether there was a Redbox in South St. Paul, and then Running asked Mikkalson to identify himself. (*Id.* at 26:21-24; Am. Compl. ¶ 11, Nov. 8, 2014, Docket No. 11.) When Mikkalson refused, Running "demanded" to see his driver's license. (Mikkalson Dep. at 26:21-24.) Mikkalson again refused, but eventually relented when Running told him that he would be arrested if he did not hand over his driver's license. (*Id.* at 27:2-10; 28:1-4.) Running checked the license using a police radio on his person, and gave it back to Mikkalson, ending the encounter. (*Id.* at 28:12-18, 29:3-5, 30:22-31:8.) Mikkalson subsequently left the scene and continued walking towards the Redbox. (*Id.* at 29:3-5.) Mikkalson admits that Running did not handcuff him, search him, display his weapon, or physically touch him. (*Id.* at 28:19-29:2.) Altogether, the encounter lasted approximately three to five minutes. (*Id.* at 27:13-17.)

## II.   GREENGO INCIDENT: NOVEMBER 25, 2012

David Greengo is a sergeant with the South St. Paul Police Department and has worked for the department for over twenty years. (Aff. of David Greengo ("Greengo

Aff.") ¶¶ 1, 3, Nov. 2, 2015, Docket No. 25.)  On November 25, 2012, at approximately 1:37 p.m., Greengo was traveling on Marie Avenue in a marked police car.  (*Id.* ¶¶ 4, 5.)  As he approached an alley located between Tenth Avenue and Eleventh Avenue, he observed an individual later identified as Mikkalson sitting "astride" on a motorcycle, seemingly about to cross Marie Avenue.  (*Id.* ¶¶ 5, 7.)  Although Greengo could not tell with "100%" certainty whether the bike was turned on, he did notice that the front headlight was off.  (*Id.* ¶¶ 8, 16.)  Mikkalson admits that the motorcycle was running but that he turned it off when he saw Greengo approach.  (Mikkalson Dep. at 40:15-23.)  Mikkalson also admits that the front headlight was off.  (*Id.* at 42:13-14.)

As Greengo drove by, Mikkalson got off the motorcycle and manually pushed it backwards into the alley, away from Marie Avenue.  (*Id.* at 34:13-16.)  Mikkalson states that he did this because Greengo looked "excited" and Mikkalson wanted "to avoid any problem" with the police.  (*Id.* at 34:14-15, 41:13-15, 45:3-6.)  Greengo, on the other hand, stated that he was immediately suspicious that the motorcycle may have been stolen based on the following facts: (1) the temperature outside was below freezing and it is uncommon for motorcycles to be used in such weather; (2) most Minnesotans had already put their bikes in storage by November 25; (3) Mikkalson seemed "unusually alarmed" by the squad car and "appeared to take evasive actions" by pushing the bike backwards into the alley, and (4) Greengo knew, based on his experience as a police officer and motorcycle rider, that motorcycle thieves often push a recently stolen motorcycle without starting it, either because they do not have keys or do not want the noise of the engine to alert the owner.  (Greengo Aff. ¶¶ 9-10, 15, 16(a)-(d).)  Greengo

also believed that he had probable cause that Mikkalson committed a traffic violation –
Minnesota state law prohibits operating a motorcycle without a headlight on.  (*Id.* ¶¶ 8,
15.)  Based on these above-described facts, Greengo decided to conduct a traffic stop.
(*Id.* ¶ 15.)  Greengo accordingly performed a U-turn and drove back towards the alley.
(*Id.* ¶ 14.)

At approximately the same time, Mikkalson pushed the bike across Marie Avenue
and entered the alley on the other side of the street.  (Mikkalson Dep. at 34:16-23;
Greengo Aff. ¶¶ 11-12.)  Because the alley sloped downwards, Mikkalson hopped onto
the motorcycle, sitting astride over the seat, and alternated between coasting down the
hill and propelling the motorcycle forward with his feet in a "waddling" manner, like
"Fred Flintstone."  (Mikkalson Dep. at 41:16-22, 46:1-4, 48:12-24; Greengo Aff. ¶¶ 11-
13.)  When Mikkalson reached a detached garage belonging to the mother of his
girlfriend, Tara McDonald, he entered the key code; opened the garage door; put the
motorcycle inside; and walked back out into the alley, leaving the garage door open.
(Mikkalson Dep. at 50:8-15, 52:18-23.)  Mikkalson had a storage arrangement with
McDonald's mother – he mowed her lawn and in return she gave him the garage's key
code with permission to store the motorcycle inside.  (*Id.* at 63:10-14.)  McDonald was
present when Mikkalson arrived and was sitting in her car, which was parked to the side
of the garage.  (Kurtz Aff., Ex. 5 ("McDonald Dep.") at 12:4-14.)  After Mikkalson
parked the motorcycle, McDonald got out of her car and stood in the alley.  (*Id.* at 22:2-
19.)

Greengo reached the alley in time to see Mikkalson coast down the slope and push the motorcycle into the garage. (Greengo Aff. ¶ 17.) Greengo entered the alley and pulled up next to the garage, where Mikkalson and McDonald were standing. (*Id.* ¶ 18-19; McDonald Dep. at 9:13-20; 22:13-17.) Greengo got out of his squad car and asked Mikkalson what was going on. (Greengo Aff. ¶ 19; Mikkalson Dep. at 50:19.) Mikkalson responded that he was "putting the bike away for storage" and he did not need any "help." (Mikkalson Dep. at 50:19-21.) Greengo told Mikkalson that he found it odd that Mikkalson was riding the motorcycle on such a cold day, and the parties briefly argued. (*Id.* at 50:23-51:2.) Greengo then asked Mikkalson for his driver's license, but Mikkalson initially refused to hand it over. (*Id.* at 51:2-4.) However, Mikkalson eventually relented after Greengo told him that their interaction was being recorded and he could go to jail if he did not comply. (*Id.* at 51:6-14; Greengo Aff. ¶¶ 19-23.) After Mikkalson handed over his driver's license, a second police officer, Jon Bush, arrived on the scene. (Greengo Aff. ¶¶ 23-24.)

Greengo reviewed the driver's license and determined that the address listed "was not related to the garage" where Mikkalson had parked the motorcycle. (Greengo Aff. ¶ 23.) According to Greengo, this discrepancy strengthened his belief that the motorcycle was stolen – he thought Mikkalson may have parked the motorcycle in a stranger's garage in order to conceal the fact that it was stolen. (*Id.* ¶ 30.) At this point, Greengo decided to enter the garage in order to check the motorcycle's license plate and VIN number – Greengo could not see either from the alley because the license plate was

facing the back of the garage, and the VIN number is located on the motorcycle's frame. (*Id.* ¶ 27.)

Before entering the garage, however, Greengo did not obtain a warrant or consent from either Mikkalson or McDonald.  To the contrary, as Greengo entered, Mikkalson repeatedly told him that he was not welcome and that the garage was private property. (Mikkalson Dep. at 51:16-52:9; McDonald Dep. at 16:10-15, 17:12-14.)  McDonald also objected to the entry, telling Greengo, "We're storing the bike."  (McDonald Dep. at 23:2-8.)  Greengo articulated three reasons for entering the garage without obtaining a warrant or consent.  First, he stated that he did not believe that Mikkalson could not "defeat a lawful traffic stop by parking the motorcycle in a detached garage before [he] was able to stop it." (Greengo Aff. ¶ 28.)  Second, because he "suspected the motorcycle was stolen, [Greengo] feared that Mikkalson would simply move the motorcycle to a different location if [he] did not immediately check the motorcycle's registration to see if it was stolen."  (*Id.*)  Third, he stated that he "suspected that Mikkalson might have parked the motorcycle in someone else's garage in order to act like he had not stolen the motorcycle." (*Id.* ¶ 30.)

After Greengo obtained the pertinent information from the motorcycle, he exited the garage and returned to his squad car to check Mikkalson's driver's license and the motorcycle's registration.  (*Id.* ¶ 31.)  When both came back as clear, Greengo reapproached Mikkalson; gave Mikkalson a brief lecture about how "the public appreciates his service"; and then returned Mikkalson's driver's license, concluding the stop. (McDonald Dep. at 18:9-19:3; Greengo Aff. ¶¶ 32-33.)

Mikkalson concedes that he was not given a ticket, arrested, charged with a crime, or placed in a jail cell.  (Mikkalson Dep. at 62:10-16.)  Mikkalson also concedes that Greengo did not handcuff him, search him, or display his weapon.  (*Id.* at 53:10-18.)  Altogether, Mikkalson's encounter with Greengo, from the time Greengo approached the garage until the time he left, lasted approximately five to ten minutes.  (*Id.* at 52:13-17.)

## III.    PROCEDURAL HISTORY

Mikkalson filed an amended complaint on November 8, 2014, bringing claims against Running and Greengo under 42 U.S.C. § 1983.  Mikkalson alleges that Running violated his Fourth Amendment rights by detaining him near the scene of the burglary and threatening to arrest him if he did not provide his driver's license.  Mikkalson also alleges that Greengo violated his Fourth Amendment rights by detaining him near the garage, taking his driver's license under a threat of arrest, entering the garage without a warrant or consent, and failing to promptly return his license.  Additionally, Mikkalson brings a state law trespass claim against Greengo based on the garage entry, and a claim under Article I, § 10 of the Minnesota Constitution against Running, Greengo, the City, and Messerich.

Mikkalson also initially brought two municipal liability claims against the City and Messerich, and multiple claims against Defendant John Doe I, but he has waived and withdrawn those claims.  (Pl.'s Mem. of Law in Opp'n to Mot. for Summ. J. at 2, Nov. 23, 2015, Docket No. 28.)  Defendants now move for summary judgment on all remaining claims.

## ANALYSIS

## I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.    SECTION 1983 CLAIMS

### A.    Running Incident

Mikkalson alleges that Running committed two Fourth Amendment violations. First, he argues that Running unlawfully seized him by stopping him near the scene of the recent burglary without a reasonable suspicion of criminal activity.  Second, he argues that even if Running was justified in initiating the stop, Running unlawfully seized him by demanding that Mikkalson produce his driver's license under a threat of arrest. Running does not contest that he seized Mikkalson within the meaning of the Fourth Amendment.  Instead, he argues that he is protected by qualified immunity.

The doctrine of qualified immunity shields police officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy J., dissenting)).  The doctrine thus gives police officers "breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law."  *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (internal quotation marks omitted) (quoting *Ashcroft v. al–Kidd,* 131 S. Ct. 2074, 2085 (2011)).  "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."

*Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

In assessing whether a police officer is entitled to qualified immunity, the Court considers two factors, which may be examined in either order: (1) whether the facts "shown make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232, 236. "Unless both of these questions are answered affirmatively, [the defendant] is entitled to qualified immunity." *Nord v. Walsh Cty.*, 757 F.3d 734, 738 (8th Cir. 2014). Finally, "[a]lthough the defendant bears the burden of proof for this affirmative defense [of qualified immunity], the plaintiff must demonstrate that the law was clearly established." *Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014) (quoting *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir.2007)).

The Court will analyze each alleged violation, and whether Running is entitled to qualified immunity, separately below.

### 1.     Initial Stop

The Fourth Amendment allows an officer to "detain a person for investigation without probable cause to arrest when the officer 'has a reasonable suspicion supported by articulable facts that criminal activity may be afoot.'" *Williams v. Decker*, 767 F.3d 734, 739 (8th Cir. 2014) (quoting *United States v. Morgan,* 729 F.3d 1086, 1089 (8th Cir. 2013)). "Reasonable suspicion is a lower threshold than probable cause, and it requires considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.*

(quoting *United States v. Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006)).   In evaluating

reasonable suspicion, the Court considers the "totality of the circumstances."   *Id.*   Factors

"such as the 'time of day or night' and 'location of the suspect parties'" may "support the

reasonableness of an officer's decision to investigate."   *United States v. Robinson*, 670

F.3d 874, 876 (8th Cir. 2012) (quoting *United States v. Dawdy*, 46 F.3d 1427, 1429

(8th Cir. 1995)).   The Court also "bear[s] in mind that law enforcement officers may 'draw

on their own experience and specialized training to make inferences from and deductions

about the cumulative information available to them.'"   *Id.* (quoting *United States v.*

*Arvizu*, 534 U.S. 266, 273 (2002)).

Applying the above standards here, the Court finds that Running had a reasonable

suspicion to detain Mikkalson.   When Running encountered Mikkalson, it was late at

night, there were very few other people in the area, and Mikkalson was walking directly

across the parking lot from a jewelry store that had recently been burglarized.   Running

also knew from experience that it is fairly common for a burglar to remain in the area or

return to the scene, either because he was not able to get away before the police arrived or

because he stashed stolen items nearby.   In light of these articulable facts, the Court

concludes that it was reasonable for Running to suspect that Mikkalson may have been

involved in the burglary and also for Running to detain Mikkalson for investigatory

purposes.

Mikkalson argues that his mere presence near the burglary site cannot be relied

upon as a fact supporting a reasonable suspicion of criminal activity, but the Court

disagrees.   As noted above, an individual's location is a valid factor that may "support the

reasonableness of an officer's decision to investigate." *Robinson*, 670 F.3d at 876; *see Losee v. Dearinger*, 911 F.2d 48, 49-50 (8th Cir. 1990) (finding that the defendants' presence in an "alley which had been used in the past as an escape route for a robbery of a nearby convenience store" was one of several factors supporting the officer's reasonable suspicion that the defendants were planning to commit a robbery); *United States v. Moore*, 817 F.2d 1105, 1106-07 (4th Cir. 1987) (finding that the defendant's presence near the scene of a recent burglary was one of several factors supporting the officer's reasonable suspicion that the defendant was involved in the burglary); *Appelgate v. Comm'r of Pub. Safety*, 402 N.W.2d 106, 108-09 (Minn. 1987) (same).

Mikkalson also argues that the twenty-three minute time gap between when Running learned of the burglary and when he encountered Mikkalson defeats the reasonableness of Running's suspicion. The Court, however, is not persuaded. Twenty-three minutes is a relatively short amount of time in the context of an active burglary investigation; Mikkalson was stopped only five minutes after the K9 unit cleared the building; and Running knew from experience that burglars commonly return to the scene of the crime, a fact that could account for the time gap.

Finally, Mikkalson contends that Running observed no suspicious behaviors that would distinguish him from an ordinary passerby. While this is technically true, Mikkalson's demeanor was not the basis for the stop or for the Court's finding of reasonable suspicion. Instead, the stop was justified based on Mikkalson's presence near a crime scene late at night, shortly after the crime occurred, when few other people were around.

Overall, because Running had a reasonable suspicion that Mikkalson was involved in the burglary, Running did not infringe on Mikkalson's Fourth Amendment rights by detaining him for investigatory purposes.   Running is therefore entitled to qualified immunity with regard to the initial stop – the facts shown do not make out a violation of a constitutional right.

## 2.      Driver's License Demand

Mikkalson next argues that Running, in violation of the Fourth Amendment, further unlawfully seized him by demanding that he turn over his driver's license under a threat of arrest.   Running argues that he is entitled to qualified immunity, and the Court agrees.

A threat by a police officer to arrest an individual if he does "not identify himself constitute[s] a seizure subject to the requirements of the Fourth Amendment."   *Vickroy v. City of Springfield*, 706 F.2d 853, 854 (8th Cir. 1983) (citing *Brown v. Texas*, 443 U.S. 47, 50 (1979)).   Whether such a seizure is reasonable, and therefore constitutional, "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."   *Id.* (citing *Brown*, 443 U.S. at 50).   The Court must weigh "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."   *Brown*, 443 U.S. at 51.   Additionally, when an officer makes such a threat of arrest during the course of an otherwise lawful investigative stop, the Court must also consider whether the threat was "'strictly tied to and justified by' the circumstances

which rendered [the stop's] initiation permissible." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)).   Indeed, "[t]he scope of an investigative detention is to be keyed to the purposes of the stop, with officers using 'the least intrusive means reasonably available to verify or dispel [their] suspicion[s] in a short period of time.'" *United States v. Jones*, 759 F.2d 633, 642 (8th Cir. 1985) (quoting *Royer*, 460 U.S. at 500).

Applying the above standards, the Court finds that Running's threat of arrest to procure Mikkalson's driver's license, and the subsequent detention while Running checked the license, was not unreasonable or arbitrary.   Running reasonably suspected, based on articulable facts, that Mikkalson was involved in a recent burglary.   Running thus had a public safety interest in determining Mikkalson's identity – identifying a suspect "during a stop near a crime scene" aids officers in investigating their suspicions and also ensures that officers will "be able to relocate the suspect should probable cause later develop." *Id.*  Preventing an officer from "ascertain[ing] the identity of a [suspect] would in many instances make investigative stops serve no useful purpose." *Id.*

Furthermore, there is no indication that Running's conduct was unrelated to the purpose of the stop or overly intrusive.   Running sought Mikkalson's license based on a reasonable suspicion of criminal activity relating to an active burglary investigation that was only twenty-three minutes old, and Running only threatened the arrest after Mikkalson refused to identify himself.   Then, after Mikkalson handed over his license, Running conducted a brief radio check and promptly returned the license, allowing Mikkalson to continue on his way to the Redbox.   The entire encounter lasted three to

five minutes.   On these facts, the Court cannot say that Running's conduct was unreasonable or that the severity of the interference outweighs the public interest supporting the detention.   In making this determination, the Court recognizes that in some instances, an officer's demand for a suspect's driver's license using a threat of arrest may constitute an unlawful seizure.   But that is not the case here.   Running is accordingly entitled to qualified immunity with regard to his demand for Mikkalson's driver's license – the facts shown do not make out a violation of a constitutional right.

Alternatively, even if Running did violate Mikkalson's constitutional right to be free from an unreasonable seizure, the Court finds that Running is still entitled to qualified immunity because this right was not clearly established at the time of the encounter.   For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."   *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).   Although there need not be "a case directly on point," a right is not clearly established unless "existing precedent [has] placed the statutory or constitutional question beyond debate." *Stanton* 134 S. Ct. at 5 (quoting *al–Kidd*, 131 S. Ct. at 2083).   Additionally, "[c]learly established law is **not** defined 'at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'"   *Parker v. Chard*, 777 F.3d 977, 980 (8th Cir. 2015) (emphasis added) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).

Here, the essential question is whether it was clearly established that Running – having a reasonable articulable suspicion that Mikkalson was involved in the burglary –

could not demand that Mikkalson turn over his driver's license under a threat of arrest and briefly detain Mikkalson in order to ascertain his identity.  The Court answers this question in the negative – it was not clearly established.

First, Mikkalson has not identified, and the Court cannot find, any controlling authority directly on point that would have put Running on notice that his conduct was unconstitutional.  Mikkalson relies on *Terry v. Ohio* for the proposition that investigative stops must be "reasonably related in scope to the circumstances which justified the interference in the first place."  392 U.S. 1, 19-20 (1968).  While this is true, *Terry* is unavailing because it establishes a general rule and does not address the particular circumstances that Running faced.

Second, Mikkalson has not identified any other existing precedent placing the constitutional question beyond debate.  To the contrary, case law suggests that a reasonable officer in Running's shoes could have believed that the threat of arrest was constitutionally proper.  In *United States v. Jones*, for example, the Eighth Circuit held that officers did not exceed the scope of a lawful *Terry* stop or transform the stop into an arrest by "persistent[ly]" asking a suspect to identify himself with their guns drawn.  759 F.2d 633, 641-42 (8th Cir. 1985).  In *Hayes v. Florida*, the Supreme Court found that "a brief detention in the field for the purpose of fingerprinting, where there is only reasonable suspicion not amounting to probable cause," is constitutionally permissible provided that "there is reasonable suspicion that the suspect has committed a criminal act, . . . there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and . . . the procedure is carried out with dispatch."

470 U.S. 811, 816-17 (1985).  In light of these cases and others, a reasonable officer could conclude that Running's conduct did not amount to an unreasonable seizure.  At minimum, *Jones* and *Hayes* illustrate that the reasonableness of a seizure depends on the facts and circumstances of the particular case, and there is no bright line rule.

Third and finally, the Supreme Court has found that a Nevada stop-and-identify law, which permits officers to arrest a suspect for failing to identify himself or herself during a *Terry* stop, does "not contravene the guarantees of the Fourth Amendment." *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 188 (2004). Although Minnesota does not have a similar stop-and-identify law, the *Hiibel* Court's holding further supports the notion that Running did not violate a clearly established right.  In upholding Nevada's law, the Court found that the arrest authorization was consistent with *Terry* because "[t]he request for identity has an immediate relation to the purpose, rationale, and practical demands of a *Terry* stop"; "[t]he threat of criminal sanction helps ensure that the request for identity does not become a legal nullity"; and the law did not "alter the nature of the stop" by, for example, changing "its duration." *Id.* The Court also found that the law would not "circumvent[] the probable-cause requirement, in effect allowing an officer to arrest a person for being suspicious," because under the law, officers still needed to have a reasonable articulable suspicion of criminal activity at the "inception" of the stop, and the request for identification had to be "reasonably related to the circumstances which justified the initial stop." *Id.* (internal quotation mark omitted) (quoting *Terry*, 392 U.S. at 20).  Here, if a law authorizing an officer to arrest a suspect for failing to identify himself or herself during a valid *Terry*

stop does not violate the suspect's right to be free from unreasonable seizures, a reasonable officer in Running's circumstances could have understood that a threat of arrest, a less intrusive measure, also would not violate that right, particularly where there was a reasonable suspicion that Mikkalson was involved in a recent burglary, identifying Mikkalson served an important public interest related to the investigation, and Running's conduct did not alter the nature of the stop.[2]

Accordingly, Running is entitled to qualified immunity for the driver's license demand, either because the facts shown do not make out a violation of a constitutional right, or the right was not clearly established at the time of the encounter.

### B.      Greengo Incident

Mikkalson alleges that Greengo committed three Fourth Amendment violations. First, he argues that Greengo unlawfully seized him by detaining him outside of the garage and threatening to arrest him if he did not hand over his driver's license. Second, he argues that Greengo unlawfully entered and searched the garage without a warrant or

---

[2] Mikkalson makes much of the fact that Minnesota does not have a stop-and-identify law, and appears to argue that this renders Running's threat of arrest unconstitutional under the Fourth Amendment. But this argument is unavailing. In *Virginia v. Moore*, the Supreme Court held that the where a state "chooses to protect individual privacy and dignity more than the Fourth Amendment requires," an officer's violation of the relevant state law does not also constitute a violation of the Fourth Amendment if the officer's conduct was otherwise constitutionally reasonable. 553 U.S. 164, 174-76 (2008). The Court wrote: "A State is free to prefer one search-and-seizure policy among the range of constitutionally permissible options, but its choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional." *Id.* at 174. Here, Running did not actually violate Minnesota's search-and-seizure policy; instead, he simply threatened to take an action not expressly authorized under state law. Furthermore, even if Running's conduct did violate Minnesota's search-and-seizure policy, this does not amount to a Fourth Amendment violation because his conduct was still constitutionally reasonable or an officer in his shoes would have believed it to be reasonable (for the reasons set forth above).

consent.  Third, he argues that Greengo unlawfully seized him by refusing to immediately return his driver's license at the conclusion of the encounter.  Greengo, on the other hand, argues that he is entitled to qualified immunity, either because his conduct was constitutionally reasonable or he did not violate a clearly established right.

### 1.    Initial Stop and Driver's License Demand

The first issue is Greengo's detainment of Mikkalson outside the garage and his demand that Mikkalson turn over his driver's license under threat of arrest.  Greengo contends that he is entitled to qualified immunity, and thus summary judgment, because he had probable cause that Mikkalson committed a traffic violation.  For the reasons that follow, the Court agrees.

It is well settled that "[a]ny traffic violation, however minor, provides probable cause for a traffic stop."  *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994).  In Minnesota, it is unlawful to "operate a motorcycle on a street or highway unless the headlight or headlights are lighted at all times the motorcycle is so operated."  Minn. Stat. § 169.974, subd. 5(i).  Additionally, during a traffic stop, an officer may conduct a reasonable investigation, which includes "asking for a driver's license and registration," and "asking questions about destination and purpose."  *United States v. Ward*, 484 F.3d 1059, 1061 (8th Cir. 2007).

Here, when Greengo first encountered Mikkalson, he observed that the motorcycle's headlight was off; Mikkalson confirmed this fact in his deposition.  Next, Greengo observed Mikkalson cross Marie Avenue, hop astride onto the motorcycle, and

coast down an alley while intermittently propelling himself forward with his feet.  Based on these observations, Greengo had probable cause to initiate a traffic stop – Mikkalson operated the motorcycle on a street without a headlight on, which is a traffic violation under Minnesota law.   Greengo was therefore constitutionally justified in detaining Mikkalson, demanding his license, and asking questions about his destination and purpose.

Mikkalson raises several counterarguments, but all are inapposite.   First, Mikkalson argues that he did not violate Minn. Stat. § 169.974, subd. 5(i), because he did not "operate" the motorcycle – the engine was turned off.   Although the Minnesota Supreme Court has not interpreted what it means to "operate" a motorcycle within the context of § 169.947, the Court concludes that if the state supreme court were to weigh in, its definition would include what Mikkalson did: sitting astride on the motorcycle, intermittently using his feet to move the motorcycle forward, and coasting when gravity allowed.   The Court presumes that one of the central purposes of the headlight requirement is to protect the public by making sure that other drivers can see motorcycles.   This public safety interest – ensuring that motorcycles are visible on roadways – exists whether the motorcycle is powered by its engine, by gravity, or by the rider's feet.   *See State v. Cole*, 591 N.E.2d 1378, 1381 (Ohio Mun. Ct. 1992) (finding that a defendant who used his feet to propel a motorcycle or coasted whenever the road grade allowed was guilty of operating a motor vehicle without a headlight); *see also State v. Jeannette*, 412 A.2d 1339, 1341 (N.J. Super. Ct. Law Div. 1980) ("[T]he public is to be protected from the operation by an intoxicated driver of a motor vehicle, whether it is

powered by its engine or gravity."). The Court thus finds that Mikkalson operated his motorcycle within the meaning of Minn. Stat. § 169.974, subd. 5(i), even though the engine was turned off.

Mikkalson next argues that even if he operated the motorcycle, he did so in an alley and not a street, rendering the statute inapplicable. However, this argument does not comport with the statutory language. "Street" is defined by statute as "any way or place when any part thereof is open to the use of the public, as a matter of right, for the purposes of vehicular traffic." Minn. Stat. § 169.011, subd. 81. "Alleyway," meanwhile, is defined as a "private or public passage" that "may be open to but is not designed primarily for general vehicular traffic." *Id.* § 169.011, subd. 2. Because the definition of alley fits within the broader definition of street, and Mikkalson does not dispute that the alley at issue was a public passage open to general vehicular traffic, the Court finds that Mikkalson operated the motorcycle in a street within the meaning of Minn. Stat. § 169.974, subd. 5(i).

Mikkalson also contends that Greengo used the purported headlight violation as a pretext to investigate whether the motorcycle was stolen. But even if this were true, it has no effect on the constitutionality of the stop. When an officer has probable cause to initiate a traffic stop, the "actual motivations of the individual officers involved" are immaterial. *Whren v. United States*, 517 U.S. 806, 813 (1996).

Finally, Mikkalson asserts that Greengo waited several minutes before entering the alley and driving up to the garage, thereby invalidating the stop. Greengo disputes this factual assertion. Yet even if the Court assumes, as it must, that Greengo was slow to act,

this does not impact the validity of the stop.  Greengo still had probable cause to believe that Mikkalson committed a traffic violation, and Mikkalson cites absolutely no case law or authority to suggest that a short time delay nullifies an otherwise lawful encounter.

Altogether, the Court finds that Greengo did not violate Mikkalson's Fourth Amendment rights by detaining him outside of the garage and demanding his driver's license under threat of arrest – Greengo had probable cause that Mikkalson operated his motorcycle on a street without a headlight on.[3]  Because no constitutional violation occurred, Greengo is entitled to qualified immunity and thus summary judgment on this issue.

### 2.    Garage Entry

Mikkalson next challenges Greengo's entry into the garage.  Greengo concedes that he did not have a warrant and did not obtain Mikkalson's consent.  Instead, Greengo argues that he is entitled to qualified immunity for two alternative reasons.  First, Greengo contends that he did not violate Mikkalson's constitutional rights because the entry was justified by exigent circumstances.  Alternatively, he argues that the constitutional right implicated by the entry was not clearly established.  The Court, however, is not persuaded by either argument.

First, viewing the facts in the light most favorable to Mikkalson, the Court finds that Greengo's warrantless entry into the garage was not justified by exigent

---

[3] Because the stop was supported by probable cause of a traffic violation, the Court need not decide the closer question of whether Greengo had a reasonable suspicion that the motorcycle was stolen sufficient to justify the stop.

circumstances.  In general, police officers may not enter a constitutionally protected space[4] without a warrant or consent; however, a warrantless entry may be justified by exigent circumstances.  *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1004 (8th Cir. 2010) (citing *Payton v. New York,* 445 U.S. 573, 590 (1980)).  The exigent circumstances "exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996).  The exception also applies if officers are "in hot pursuit of a fleeing suspect." *United States v. Anderson*, 688 F.3d 339, 344 (8th Cir. 2012) (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)).

Here, Greengo contends that he entered the garage because he was concerned about destruction of evidence – Mikkalson would simply move the motorcycle, preventing Greengo from completing the traffic stop and determining whether the motorcycle was stolen.  But the facts belie this argument.  When Greengo entered the garage, another officer, Bush, was already present at the scene.  The Court can discern no reason why Greengo and Bush could not have worked together to secure the area and prevent the destruction of evidence.  For example, the officers could have parked a squad car in front the garage, one officer could have briefly detained Mikkalson, and the other officer could have taken whatever steps were necessary to obtain a warrant.  Greengo

---

[4] At oral argument, Greengo appeared to concede that Mikkalson had a Fourth Amendment interest in the garage.  The Court agrees.  Although Mikkalson did not own the garage, he had a reasonable expectation of privacy in the premises by virtue of his storage-rental agreement with McDonald's mother.  *See, e.g.*, *Garcia v. Dykstra*, 260 F. App'x 887, 898 (6th Cir. 2008) (finding that a plaintiff had a reasonable expectation of privacy in a rented storage unit).

also cannot rely on the hot pursuit doctrine – Mikkalson was not attempting to flee the scene, and Greengo indisputably entered the garage to check the license plate and VIN number on the motorcycle.  No exigent circumstances existed.

Greengo next argues that even if he did violate a constitutional right by entering the garage, that right was not clearly established at the time of the incident.  As an initial matter, the Court finds that a reasonable officer in Greengo's situation would have known, based on existing precedent, that there were no exigent circumstances justifying the warrantless entry.  The essential question is thus whether it was clearly established that Greengo could not enter the garage – a space in which Mikkalson had a protected Fourth Amendment interest – absent a warrant, consent, or exigent circumstances.  The Court answers this question in the affirmative – the right was clearly established.  *See Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523, 528-29 (1967) ("[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant."); *see also Payton*, 445 U.S. at 589-90.  Thus, a reasonable officer would have known that the entry was unlawful, and Greengo is not entitled to qualified immunity.

Greengo attempts to frame the clearly established issue in a different manner:  a reasonable officer would not have known that the entry was unconstitutional because Mikkalson had no apparent connection to the open and detached garage.  Greengo contends that he believed that Mikkalson parked the motorcycle in the garage at random, presumably to evade police contact, based on the facts that Mikkalson's driver's license did not match the address associated with the garage, and Mikkalson had exhibited

evasive behavior.  If Greengo's belief was in fact reasonable, then this could perhaps change the outcome of the clearly established analysis.  The Fourth Amendment protection against unreasonable searches and seizures is "personal and may not be vicariously asserted."  *United States v. Bearden*, 780 F.3d 887, 892 (8th Cir. 2015). Pursuant to this clearly established law, if Greengo reasonably believed that Mikkalson did not have a Fourth Amendment interest in the garage and had no standing to object to the entry, then a reasonable officer in Greengo's situation might not have known that he was violating **Mikkalson's** constitutional rights by entering the garage.[5]  As the Supreme Court has made clear, qualified immunity shields officers who "make reasonable but mistaken judgments."  *Stanton*, 134 S. Ct. at 5 (internal quotation mark omitted) (quoting *Ashcroft v. al–Kidd,* 131 S. Ct. 2074, 2085 (2011)).  Yet the Court need not decide whether this is a viable argument because Greengo's belief that Mikkalson had no connection to the garage was not reasonable.

First, Greengo could not rely solely on the fact that Mikkalson's driver's license did not match the garage because many people have driver's licenses with discrepant or outdated addresses.  Greengo further asserts that he relied on Mikkalson's purported evasive behavior, but this reliance was also not reasonable.  Even if Greengo believed that the motorcycle was stolen, there is no evidence that Greengo made even a cursory investigation into Mikkalson's connection to the garage prior to his entry.  For example, there is no indication that Greengo asked Mikkalson about the discrepant driver's license

---

[5] A reasonable officer would have known that he was violating someone's rights, just not Mikkalson's.

address.  Mikkalson also did not ask any questions of McDonald, who was at the scene. Instead, Greengo simply entered the garage, without seeking consent and over the verbal objections of both Mikkalson and McDonald.  Given this conduct, the Court finds that Greengo could not have reasonably believed that Mikkalson had no association or connection to the garage.  Accordingly, Greengo is not entitled to qualified immunity for the garage entry, and the Court will deny his motion for summary judgment on this issue.

### 3.      Failure to Promptly Return Driver's License

Finally, Mikkalson argues that he was unconstitutionally detained when Greengo gave him a brief lecture about cooperating with police before returning his driver's license.  Even though Greengo's conduct may have constituted a seizure, Mikkalson has not satisfied his burden of showing clearly established precedent that would have put Greengo on notice that his actions were unlawful.  Mikkalson may have found the short civics lecture distasteful, but Greengo did not violate a clearly established Fourth Amendment right.

## III.   TRESPASS CLAIM

Mikkalson next brings a common law trespass claim against Greengo based on the garage entry.  To prevail on a trespass claim, a plaintiff must show "the right of possession . . . and wrongful and unlawful entry upon such possession by defendant." *All Am. Foods, Inc. v. Aitkin Cty.*, 266 N.W.2d 704, 705 (Minn. 1978) (quoting 19A Dunnell Dig. (3d ed.) § 9687).  Here, viewing the evidence in the light most favorable to Mikkalson, the Court finds that both elements are satisfied.  Mikkalson had a right of

possession in the garage based on his storage agreement with McDonald's mother, and Greengo's warrantless entry into the garage was unlawful (for the reasons outlined above).

Greengo argues that he is entitled to summary judgment based on official immunity, but official immunity does not apply here.  Under Minnesota law, "a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong."  *Elwood v. Rice Cty.*, 423 N.W.2d 671, 677 (Minn. 1988) (quoting *Susla v. State*, 247 N.W.2d 907, 912 (1976)).  To determine whether official immunity is available, the Court performs a two-step inquiry: (1) whether the alleged acts are discretionary or ministerial; and (2) if the acts were discretionary, whether they were malicious or willful.  *Id.*  A defendant is "entitled to summary judgment on the basis of official immunity if there are no genuine issues of material fact tending to show" that the defendant's discretionary acts were malicious or willful.  *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994).

In this case, the parties do not dispute that Greengo's acts were discretionary. Application of official immunity instead turns on whether Greengo's acts were malicious and willful.  In the context of official immunity, malicious and willful are synonyms and mean "the intentional doing of a wrongful act without legal justification or excuse."  *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991) (quoting *Carnes v. St. Paul Union Stockyards Co.*, 205 N.W. 630, 631 (Minn. 1925)).  Put another way, an act is malicious and willful if it is intentional and the "official has reason to believe [it] is legally

prohibited." *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 663 (Minn. 1999).  Here, as explained above, Greengo intentionally entered the garage without legal justification or excuse and had reason to know that this act was legally prohibited – there were no exigent circumstances, he did not have a warrant or Mikkalson's consent, and Greengo could not have reasonably believed that Mikkalson had no connection to the garage. Consequently, Greengo is not entitled to official immunity, and the Court will deny his motion for summary judgment on this claim.

## IV.    MINNESOTA CONSTITUTION CLAIM

Mikkalson lastly asserts a claim against Running, Greengo, the City, and Messerich under Article I, § 10 of the Minnesota Constitution, alleging that Defendants violated his state constitutional right to be free from unreasonable searches and seizures. Defendants argue that this claim fails as a matter of law because Minnesota does not recognize private remedies for violations of the Minnesota Constitution.  Mikkalson concedes that a plaintiff may not pursue money damages for violations of the state constitution, but argues that he seeks only injunctive, declaratory, and equitable relief, which is allowed or, as an issue of first impression, should be allowed.  But the Court will decline to consider the extent to which Mikkalson can pursue claims under Article I, § 10 because it need not reach this issue.  Even if injunctive, declaratory, and equitable relief were available, Mikkalson has failed to show entitlement to such relief.

To receive injunctive relief under Minnesota law, a plaintiff must demonstrate, among other things, that "the injunction [is] necessary to prevent irreparable injury."

*Citizens for a Safe Grant v. Lone Oak Sportsmen's Club, Inc.*, 624 N.W.2d 796, 806-07 (Minn. Ct. App. 2001) (citing *Cherne Indus., Inc. v. Grounds & Assoc.*, 278 N.W.2d 81, 92 (Minn. 1979)).  Here, Mikkalson seeks an injunction requiring the City to discipline Running and Greengo, to change its policies and procedures, and to restrain officers within the City's police department from committing future constitutional violations.  But Mikkalson offers absolutely no evidence as to why this relief is necessary to avoid irreparable injury.  To be entitled to declaratory relief under Minnesota law, a plaintiff must show "an actual, justiciable controversy."  *McCaughtry v. City of Red Wing*, 808 N.W.2d 331, 337-38 (Minn. 2011).  Here, Mikkalson has not specified what type of declaratory relief he is seeking, let alone a justiciable controversy.  Finally, Mikkalson does not identify any other grounds for equitable relief.  Accordingly, the Court will grant Defendants' motion for summary judgment on Mikkalson's state constitution claim.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 21] is **GRANTED in part** and **DENIED in part**, as follows:

1.     The motion with respect to Mikkalson's § 1983 claim against Greengo regarding Greengo's entry into the garage, as alleged in Count 2 of the Amended Complaint, is **DENIED**.

2.      The motion with respect to Mikkalson's trespass claim against Greengo, as alleged in Count 6 of the Amended Complaint is **DENIED**.

3.      The motion in all other respects is **GRANTED**.

4.      Defendants Running, Messerich, John Doe I, and the City of South St. Paul are **DISMISSED with prejudice** from this case.


DATED:   August 8, 2016                          _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                            JOHN R. TUNHEIM
                                                             Chief Judge
                                                  United States District Court